UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| REXEL D. BERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:11CV24 TIA |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On April 7, 2008, Plaintiff protectively filed an application for Supplemental Security Income benefits ("SSI"), alleging disability beginning December 1, 2005 due to an inability to read or write; a left arm and hand injury; and back problems.  (Tr. 11, 52, 100-102)  Plaintiff's application was denied on May 27, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 48, 52-56, 59)  On June 3, 2010, Plaintiff appeared and testified at hearing before an ALJ.  (Tr. 24-47)  In a decision dated August 23, 2010, the ALJ determined that Plaintiff had not been under a disability at any time since April 7, 2008.  (Tr. 11-20) After considering additional evidence, the Appeals Council denied Plaintiff's Request for Review on January 18, 2011.  (Tr. 1-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  The ALJ first examined Plaintiff, who testified that he lived by himself in a camper in Jackson, Missouri across the street from his parents.  He was born on November 14, 1957, and he competed the 10th grade.  Plaintiff did not have any vocational or other education.  His prior jobs included work as a painter and janitor. Plaintiff believed the most money he made was about $200 a week working for his stepfather in the 1990's.  However, Plaintiff had not worked since April 2008.  Plaintiff received assistance from Family Services and from his parents.  Plaintiff's parents owned the land he lived on, and they paid his electric bills.  Plaintiff helped by mowing their yard.  (Tr. 26-31)

Plaintiff's attorney also questioned Plaintiff regarding his alleged inability to work.  Plaintiff testified that he had a bad left arm, which required an operation, and a bad back that was crushed in a motorcycle accident.  He stated that he was left handed and that his left arm had been broken 12 or 13 times.  His entire arm hurt all the time, and arthritis had set in.  In addition, the pain began in the shoulder and moved to his fingers.  Although the pain was constant, Plaintiff testified that the pain was worse when it was cold or rainy.  He also experienced weakness in his arm, which prevented him from lifting.  If he tried to pick up something heavy, his wrist hurt.  Plaintiff pointed out the various places in his wrist, hand, and arm that had been broken.  He believed he could lift about 15 pounds with his right arm but only about 5 with his left.  Plaintiff also had problems lifting his arm over his head because he dislocated his shoulder twice.  In addition, his pinky finger was constantly numb. He had no grip strength in his left hand, so he mostly used his right hand.  Plaintiff stated that he had difficulty steering a riding mower and picking up small objects.  He explained that his hand shook all the time because the various breaks had bothered his nerves.  (Tr. 31-35)

2

Plaintiff also testified that he had trouble writing, which he described as scribbling, due to problems with his hand and the fact that he was not very bright.  Further, Plaintiff testified that he had difficulty reading.  He attended special education classes while in school.  (Tr. 35-36)

Plaintiff was not seeing a doctor for his left arm problems.  He stated that he did not have the money for a doctor and had no insurance.  Plaintiff stated that the last doctor that examined him recommended re-breaking Plaintiff's arm by his wrist and inserting pins.  However, his arm would be straight, and Plaintiff would not be able to bend it much.  During the hearing, Plaintiff held his arm close to his body to keep it from getting hurt.  (Tr. 36-37)

With regard to his right arm and hand, Plaintiff testified that he had arthritis in the elbow and wrist.  Additionally, his ankles hurt because both had been broken.  Plaintiff's ankle problems affected his ability to walk because the further he walked, the more his ankles hurt.  Plaintiff stated he needed to take a break after walking one block.  Further, he could not stand in one place very long due to pain.  Plaintiff described his pain as all over, with the worst pain located in his back.  He did nothing about the pain in his arm.  Plaintiff reiterated that he lived in a camper and received food stamps.  He was able to cook for himself.  He did not see a doctor because he was unable to afford medical services.  (Tr. 37-38)

The ALJ also re-examined Plaintiff and asked about his daily activities.  Plaintiff stated that he shopped for his own food about twice a month.  Sometimes he only goes once a month with his father and tries to buy enough to last a month.  Plaintiff was able to drive but did not have a license.  Plaintiff cooked and cleaned his camper.  His mother did his laundry, and he burned his garbage.  Plaintiff was able to mow his parents' lawn with a riding mower, which took him about 3 ½ hours.  During the day, Plaintiff dusted and cleaned the house; visited his parents; helped his parents with

3

chores in their house; and helped his mother in the yard.  He did not engage in any entertainment activities.  However, he did go hunting and fishing whenever he could afford a fishing license. Plaintiff had fished and deer hunted with in the past year.  In addition to visiting his parents, Plaintiff saw neighbors and cousins.  He did not talk on the phone, belong to any social organizations, or go out to eat.  Plaintiff opined that he got along okay with other people.  He was unable to balance a savings or checking account.  However, he could keep up with appointments, count change, and take care of his personal hygiene and grooming.  Plaintiff did not read, use a computer, or have a cell phone.  (Tr. 39-43)

In addition, the ALJ questioned Plaintiff about his alcohol use.  Plaintiff stated that he was a social drinker.  Some weeks he did not drink at all.  Other times he would drink a few beers if someone brought them over.  Once in a great while, Plaintiff purchased beer for himself.  (Tr. 43-44)

A Vocational Expert ("VE"), Denise Wadell, also testified at the hearing.  The ALJ asked the VE to assume a hypothetical individual, with the same age, education, and vocational background as Plaintiff.  He could perform the physical exertional requirements of light work, with no working overhead.  Further, the individual could frequently, but not constantly, use his left dominant arm for reaching, handling, and fingering.  He needed to avoid exposure to cold, wetness, or humidity.  In addition, he should not be required to perform reading or writing on the job.  However, he could understand, remember, and carry out simple instructions and make simple work-related decisions. The individual also could deal with only occasional changes in work processes and environments. In response to this hypothetical, the VE testified that the individual could perform such jobs as collator operator, small parts assembler, and connector assembler.  These jobs were light and unskilled, with significant numbers existing in both the national and Missouri markets.  However, if

4

the hypothetical changed to only occasional use of the left dominant arm, the individual could not perform those jobs or any other jobs. (Tr. 44-46)

In a Disability Report – Adult, Plaintiff reported that he was 6 feet, 1 inch and weighed 185 pounds. He listed his impairments that limited his ability to work as "can't read or write, left arm & hand injury, back problems." Plaintiff explained that he could read and write a little bit but had trouble with big words. He did not have the chance to go to school because he had to work instead. He had trouble concentrating and remembering instructions. In addition, Plaintiff had difficulty standing for long periods because his back hurt. He tried to stand for only 10 minutes at a time. In addition, his joints became stiff, especially in his back, during the winter. When he attempted using a weed eater, his hand swelled and his back hurt, requiring him to sit down. He could lift at least 50 pounds with his right arm but very little with his left. (Tr. 116-17)

Plaintiff completed a Missouri Supplemental Questionnaire on April 30, 2008. Plaintiff stated that he was unable to work because his left hand and arm broke. He was unable to work with his hand due to pain and swelling, and he also experienced pain in his back. Lifting, back and forth motion, and vibration made his symptoms worse. Plaintiff used a wristband when mowing the lawn. He was unable to pay bills, use a checkbook, or complete a money order. Plaintiff was able to count change, and his mother made sure the bills were paid. With regard to activities, Plaintiff reported that he could not do laundry, wash dishes, iron, perform car maintenance, rake leaves, garden, or perform banking activities. He was able to make his bed, vacuum/sweep, perform home repairs, and go to the post office. Plaintiff could shop 1 to 2 times weekly for about 30 minutes when someone took him to town. Plaintiff cooked whatever he wanted to eat but had a hard time with can openers. (Tr. 135-38)

5

With regard to sleeping, pain would cause Plaintiff to wake up, and his hand and arm went numb.  Grooming, dressing, and bathing were more difficult.  He did very little during the day. Plaintiff reported mostly cooking.  He could watch a two hour movie and an hour of TV.  However, he needed to get up, walk around, and do something so his hand and back would not hurt.  Plaintiff stated he could not read.  He was able to drive but did not have a license.  Further, he had difficulty following written or verbal instructions because he was unable to read or write.  Plaintiff had problems getting along with others because he became very agitated.  (Tr. 139-42)

Also on April 30, 2008, an unnamed third party completed a Function Report Adult – Third Party on behalf of Plaintiff.  The person knew Plaintiff all his life and spent time with him grocery shopping and paying bills.  During the day, Plaintiff picked up cans, called family, and sometimes visited with friends and family.  Plaintiff had been able to do anything before his condition.  In addition, swelling and pain affected his sleep.  He had no problems with grooming, nor did he need reminders to take care of personal needs or take medication.  In addition, he could prepare his own meals daily; however, he could not twist a can opener or lift a heavy pot or skillet with one hand. Although Plaintiff could not do laundry or ironing, he was performing some yard work, house cleaning, and home repairs.  He shopped for food and clothes.  The third party also reported that Plaintiff's hobbies included watching TV and hunting.  He could watch TV anytime and hunt in the season he could use a light gun.  Further, Plaintiff's conditions affected his ability to lift, sit, understand, squat, kneel, bend, stand, use hands, follow instructions, see, walk, remember, concentrate, and get along with others.  The third party stated that Plaintiff was in a lot of pain, which affected his abilities.  He could only walk ½ to 1 block before needing to rest.  Plaintiff did not follow recipes or spoken instructions very well.  In addition, Plaintiff could not handle stress or changes in

6

routine.[1]  (Tr. 153-61)

On April 11, 2009, John Paul Marquez completed a Function Report – Adult.  Plaintiff's daily activities included waking up, going to his mother's home for breakfast, walking his mom's dog, helping his mom get around the house, and going home.  Plaintiff's dad helped with the dogs. Plaintiff could no longer perform the construction work he was able to do before his conditions.  Pain throughout his body affected his sleep.  In addition, Plaintiff could prepare meals such as sandwiches, cabbage, and potatoes once a day.  He could also clean the kitchen and bathroom.  He walked outside 5 to 6 times daily and shopped for food once a month.  A shopping trip took 1 ½ hours.  He did not pay bills, handle a savings account, or use a checkbook because he had no money.  Mr. Marquez reported that Plaintiff's conditions affected all of his abilities because of the pain related to those conditions.  Mr. Marquez opined that Plaintiff could walk 10 blocks before needing to rest for 10 minutes.  Plaintiff was unable to concentrate for very long.  He sometimes finished what he started, but he did not follow written instructions well due to his inability to read and write very well.  In addition, he had difficulty comprehending some spoken instructions.  Plaintiff did not get along well with authority figures and had been fired from a job for disagreeing with his boss.  He did not handle stress well but could handle changes in routine.  (Tr. 175-81)

School records demonstrated that Plaintiff attended special education classes in 9th and 10th grades. (Tr. 119)  In addition, during the social security application process, Plaintiff had difficulty hearing.  He did not try to read but had his sister read and explain everything.  In addition, Plaintiff had trouble staying focused.  (Tr. 113)

---

[1]  The undersigned notes that Plaintiff signed the form as the person completing said form. The report is unclear as to whether Plaintiff or a third party actually completed the Function Report.

### III.  Medical Evidence

On May 8, 2008, Plaintiff was seen at Midwest Bone and Joint Center for a disability evaluation at the request of Disability Determinations.  Nola Moore, FNP and ONP-C, noted that the Plaintiff reported left arm and wrist pain following a fracture.  He specified that he had fourteen fractures to his left wrist and arm and two left shoulder dislocations.  Plaintiff previously worked as a handyman for his father; however, he had been unable to work over the past two years.  Past surgeries included open reduction, internal fixation ("ORIF") of left arm and wrist, along with lung surgery.  Plaintiff reported muscle pain, spasms, and arthritis.  He denied that he was an alcoholic, although he consumed a 12 pack of beer every 3-4 days.  Neurological exam revealed fluent speech and the ability to follow commands fairly well.  His gait was normal with slightly forward posture, and he could independent heel-toe walk without difficulty.  He had slight difficulty with tandem walking, and sensation was normal except for the L5 dermatome to the left lower extremity.  Straight leg raising was negative.  In addition, examination of his extremities revealed no swelling, warmth, or erythema.  (Tr. 196-97)

With regard to subjective functional limitations, Plaintiff felt he could walk one fourth of a mile.  He reported some difficulty with lifting due to pain in his left arm but had no problems lifting with the right arm.  Further, he expressed difficulty hearing, as well as difficulty buttoning and unbuttoning his shirts due to pain and weakness in his left hand and arm.  Objective functional limitations included: decreased motion to the left wrist with dorsiflexion to 40 degrees; palmer flexion to 30 degrees; radial deviation at 20 degrees; and ulnar deviation at 10 degrees.  Plaintiff also demonstrated decrease strength in the left wrist with a grip strength of 4/5.  A range of motion chart indicated no decreased range of motion in the shoulder or in the right elbow, wrist, grip strength, or

upper extremity. Plaintiff exhibited slight decreased range of motion in the left elbow, wrist, grip strength, and upper extremity. Flexion of the hip, cervical spine, and lumbar spine were normal, with no lower extremity muscle weakness. Ms. Moore did not provide a mental status exam and indicated that a psychiatrist would need to complete that report. (Tr. 197-201)

A Psychiatric Review Technique form completed on May 23, 2008, by a State Agency non-examining medical consultant revealed that the Plaintiff did not have a mental disorder but did suffer from alcohol abuse. Plaintiff had no functional limitations in activities of daily living; maintaining social functioning; or maintaining concentration, persistence, or pace. He showed repeated episodes of decompensation, each of extended duration. The consultant's notes indicated that Plaintiff alleged disability due to an inability to read or write. Further, the consultant noted a normal exam in July of 2007, as well as current exam findings of normal mental status and neurological findings. The consultant opined that Plaintiff's allegation was credible, but he was able to work in the past despite the alleged inability to read and write. The consultant concluded that the evidence did not demonstrate a severe mental impairment which would prevent Plaintiff from engaging in work related activities. (Tr. 202-12)

On May 27, 2008, a non-examining medical consultant completed a Physical Residual Functional Capacity Assessment. Primary diagnosis was status post left arm fracture; secondary diagnosis was alcohol abuse. Plaintiff also alleged back problems. The consultant opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull with some limitations in the upper extremities. In addition, Plaintiff had no postural limitations, no visual limitations, no communicative limitations, and no environmental limitations. He was limited

9

in his ability to handle due to some loss of range of motion in the left wrist and a 4/5 grip strength. The consultant opined that Plaintiff's allegations were only minimally credible and that he had the residual functional capacity to perform medium work with the non-exertional restrictions as noted. (Tr. 213-18)

On June 11, 2008, Plaintiff was seen at the Boone Convenient Care Clinic for left arm pain. Plaintiff reported swelling and pain, as well as a knot around his left wrist area.  Plaintiff stated that he had broken his left arm 13 different times.  He did not use his left arm because it was painful. Plaintiff also reported that he did not have money to undergo a suggested operation.  Plaintiff also reported chronic low back pain.  The physical examination was normal.  The exam specifically revealed full range of motion in the left shoulder and limited supination in the left elbow.  The upper and lower extremities were intact, and Plaintiff was able to walk with no limping.  The physician assessed sciatic pain and left arm arthralgia.  Plaintiff was prescribed ibuprofen and Flexeril.  (Tr. 229-30)

Dr. Barry Gainor examined Plaintiff on October 24, 2008 at the University of Missouri Orthopaedic Clinic.  Plaintiff requested that Dr. Gainor "look at this arm" where Plaintiff had fractured his left wrist over 2 years before.  Plaintiff also reported weather-related symptoms in his wrist.  Additionally, Plaintiff complained of pain all over and mentioned about 12 or 13 fractures in his left upper extremity over the years.  During the examination Dr. Gainor noted that Plaintiff's left hand was neurovascularly intact.  The dorsiflexion of the wrist was 52 degrees, and volar flexion was 33 degrees.  Plaintiff's power grip was 10 kgs in the left hand compared to 45 kgs in the right, and there was a bump at the ulnar styloid.  In addition, Dr. Gainor reviewed x-rays and noted that Plaintiff had a biarticular wrist fracture many years before with fracture of the ulnar styloid and radius

10

extending into the radioulnar joint.  Dr. Gainor stated that this had healed in a settled position with an ulnar plus wrist.  He also noted post traumatic changes of osteoarthritis of the radiocarpal joint. Dr. Gainor recommended surgery, but Plaintiff did not seem interested.  Plaintiff was to return on an as-needed basis.  (Tr. 231-33)

On May 18, 2009, Dr. Craig S. Heligman examined Plaintiff at Moberly Occupational Medicine at the request of Disability Determinations.  Plaintiff reported that he had previously filed for social security benefits but had been denied.  Plaintiff complained of left wrist and arm pain, as well as constant back pain, which was worse in the winter.  He described the pain as shooting down into both feet and up into his neck causing headaches and ringing in his ears.  Plaintiff reported that he could walk only two blocks before his feet and ankles hurt, and he could only stand 10 minutes before needing to move. Plaintiff stated that he could sit for 30 minutes before changing positions and that he could lift and carry up to about 20 pounds with reduced use of his left hand. He could drive without restrictions but was unable to pay licensing fees.  Further, Plaintiff reported no limitation to his ability to provide self-care and personal hygiene, eat and prepare food, communicate, or clean and care for his residence.  (Tr. 221-22)

Upon examination, Dr. Heligman observed a well developed, well nourished man in no acute distress.  Plaintiff displayed no discomfort while seated but reported pain with every movement.  He could sit without fidgeting or changing position, get on and off the exam table without assistance, and dress and undress without assistance.  Dr. Heligman noted full range of motion to forward flexion, extension, and left and right lateral flexion in Plaintiff's back.    Examination of Plaintiff's back also revealed mild thoracic scoliosis with no sacroiliac joint tenderness or pain with compression/distraction of pelvis.  Supine straight leg raise was about 70 degrees without radiating

leg pain bilaterally, and sitting straight leg raise was inconsistent with supine straight leg raise. (Tr. 222-23)

With regard to Plaintiff's upper extremities, Dr. Heligman noted full strength and range of motion at bilateral shoulders and right elbow, forearm, and wrist. Plaintiff's motor strength was 5/5, and muscle tone and bulk were symmetrical without evidence of atrophy. Plaintiff demonstrated reduced range of motion at the left elbow and wrist, with mild reduced pinch and grip in the left hand compared to the right. Lower extremity and neurological examinations were normal, except for reduced sensation in the ulnar distribution of left hand (5th digit) distal to wrist. Pain inventories indicated pain symptoms in the whole body but no radiculopathy. Dr. Heligman noted that although Plaintiff rated his pain as 9 out of 10, the rating was inconsistent with observed behaviors and clinical examination findings. He diagnosed lumbago without evidence of radiculopathy or myelopathy; history of multiple fractures to left forearm with persistent reduced sensation in the fifth digit, angulation of forearm, reduced range of motion at wrist, and reduced grip relative to right hand; and learning disorder. Dr. Heligman found that Plaintiff was capable of functioning a the light level, which had no restrictions in sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, seeing, and traveling. (Tr. 223-25)

With regard to mental impairments, Dr. Heligman noted limitations in this area related to reading, writing, and understanding. He stated that this assessment should be better defined on evaluation with the appropriate vocational, education, or mental health expert. Dr. Heligman expressed no recommendation for or against any administrative action related to eligibility or award of benefits. (Tr. 225-26)

On June 13, 2010, Plaintiff presented to the University Hospital Emergency Room after a 12

foot fall from a tree while cutting branches.  The Plaintiff reported sharp pain in his lower back.  A 12-point review of symptoms was totally negative except for complaints of back pain.  Chest x-ray and x-rays of the extremities were unremarkable.  A CT scan revealed the presence of an L2 burst fracture.  Plaintiff was admitted to neurosurgery.  (Tr. 234-35, 248-51)

During his examination, Plaintiff reported that he drank between 4 and 6 beers a day, and more if someone brought it over.  In addition, Plaintiff stated he had been in good health without significant difficulties over the past several months except for arthritic pain, hand pain, and occasional pain in his ankle.  Plaintiff demonstrated 5/5 strength in bilateral upper and lower extremities.  He reported paresthetic sensation in his left foot which was concerning for injury of the calcaneus versus the ankle.  The examining physician noted that Plaintiff fell with alcohol on board.  (Tr. 236-39)

An MRI of Plaintiff's lumbar spine revealed a burst fracture of L2 with anterior wedged deformity causing moderate central canal stenosis; probable L1 spinous process fracture or bone bruise; lower lumbar degenerative disc with mild central canal stenosis at L4-L5; and mild to moderate foraminal stenosis at L4-L5 and L5-S1.  In addition, the MRI showed an annular tear at L3-L4.  (Tr. 252-53) X-rays of Plaintiff's feet showed no acute fracture or dislocation. X-rays of his forearms showed distal radial metaphyseal and radial head irregularity from healed prior fractures in the left arm.  (Tr. 256-57)

Upon discharge June 14, 2010, the physician noted that Plaintiff received intravenous pain medication overnight and placed on full spine precautions with a TLSO brace for the lumbar burst fracture.  Physical therapy services noted that he was able to ambulate at a functional level with his brace and cleared him for home.  Plaintiff received oral pain medication and was discharged in an improved condition.  Plaintiff was instructed not to lift more than 5 pounds or drive.  He could

13

gradually resume normal walking activities.  (Tr. 240-44)

Plaintiff followed-up with the Neurosurgery Clinic at the University Hospital on June 28, 2010.  X-rays of the lumbar spine indicated an L2 burst fracture without any significant change in the height of the L2 vertebral body.  Increased focal kyphosis at L2 was present as was persistent anterolisthesis of L1 on L2, minimally increased from the prior exam.  Additionally, the radiologist observed narrowing at the central canal at L2.  Dr. Henry D. Mollman noted that the comparison of the lumbar spine films to those on the CT scan demonstrated definite collapse of the anterior portion fo the vertebral body, slight retropulsion of the superior aspect of the vertebral body of L2 into the canal, and a Cobb angle now up to 20.5 degrees.  Plaintiff reported quite a bit of pain with no numbness or tingling in the legs, no weakness, and no bowel or bladder difficulties.  Dr. Mollman recommended that Plaintiff consider instrumentation and surgical correction of the deformity in his back.  Dr. Mollman also noted that Plaintiff was reluctant to consider surgical intervention at that point, so they agreed to wait a month and then reevaluate. (Tr. 266, 276-79)

Plaintiff presented to the University Hospital Emergency Room on July 7, 2010, after he felt a pop and increased back pain.  The Plaintiff described constant sharp pain at the center of his back which did not radiate down to his legs.  The examining doctor assessed an L2 burst fracture with possible muscle spasms that did not require immediate surgical consideration.  X-rays of Plaintiff's lumbosacral spine revealed the L2 burst fracture and moderate to severe L1 to L2 intervertebral disc space narrowing and kyphosis at L2.  The x-rays also showed persistent 8mm of anterior listhesis of L1 relative to L2 and anterior osteophytes at L3-L4.  (Tr. 260-65, 268)

Plaintiff returned to Dr. Mollman on July 15, 2010 to discuss possible surgery, which was then scheduled for July 20, 2010.  Plaintiff's main complaint was back pain.  He rated the level of his pain

as 7.5 to 8 out of 10.  X-rays of the Plaintiff's lumbar spine again showed the L2 burst fracture which was more severe on the left side and was causing mild scoliosis.  Multiple round hypodensities and minimal anterolisthesis at L1-L2 were also noted.  (Tr. 269, 280-81)

On August 5, 2010, Dr. Marshall Cress at the University Neurosurgery Clinic examined Plaintiff for follow up after a T12-L4 percutaneous pedicle screw fixation and kyphoplasty at L2. Plaintiff was doing well, with pain that was somewhat improved.  He was walking up to a block twice a day.  Plaintiff reported increased pain after he walked but no significant radicular pain.  Dr. Cress noted that upright thoracolumbar films showed good alignment of the spine with continued good construct.  Plaintiff's brace was removed, Dr. Cress provided a refill of Norco and prescribed Flexeril and Ibuprofen.  He also instructed Plaintiff not to walk so much that it would make him uncomfortable. X-rays of the lumbar spine taken that day showed T12-L4 posterior fusion straddling and L2 fracture S/P vertebroplasty, as well as T5-T6 disc and vertebral body abnormalities.  (Tr. 271-73, 282-83)

On September 2, 2010, Plaintiff presented to Dr. Mollman for follow up of his back surgery. Dr. Mollman noted that Plaintiff ambulated without difficulty and had no deficit in the lower extremities.  Films demonstrated good positioning of the hardware and no kyphotic deformity.  Dr. Mollman continued the weight lifting restriction of 35 pounds.  (Tr. 274, 285-86)

## IV.  The ALJ's Determination

In a decision dated August 23, 2010, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 7, 2008.  He had the following severe impairments: lumbago; lumbar 2 burst fracture on June 13, 2010; status post left arm fractures; and learning disorder.  The ALJ noted Plaintiff's medical records and medical history pertaining to his left arm and lumbar

fractures.  The ALJ found, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ considered Plaintiff's physical impairments in light of Listings 1.02 and 1.04 and Plaintiff's mental impairment under Listing 12.05 and found that Plaintiff's impairments did not meet the criteria in any of those Listings.  (Tr. 11-16)

The ALJ then found that Plaintiff had the residual functional capacity (RFC) to perform less than the full range of light work, except that he was unable to perform any work overhead.  He could frequently, but not constantly, use his left dominant upper extremity for reaching, handling, and fingering.  In addition, he needed to avoid temperatures of 65 degrees or less and avoid exposure to wetness and humidity.  Plaintiff could not be required to do any reading or writing on the job, but he could understand, remember, and carry out simple instructions, as well as make simple work related decision.  He could deal with only occasional changes in work processes and environment.  The ALJ noted that Plaintiff was able to perform many daily activities.  Although his medically determinable impairments could be expected to cause some of the alleged symptoms, the ALJ found that Plaintiff's statements were not credible to the extent they were inconsistent with the RFC assessment.  Further, the ALJ considered the lack of treatment, including a failure to seek medical care through the state or charitable organizations.  (Tr. 16-18)

The ALJ noted that Plaintiff had no past relevant work.  In light of his age, which was closely approaching advanced age, his "limited' education, work experience, and RFC, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  The ALJ relied on the VE's testimony which cited several jobs nationally and in Missouri.  Thus, the ALJ concluded that Plaintiff had not been under a disability since April 7, 2008.  (Tr. 18-

20)

### V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion.  Marciniak, 49 F.3d at 1354.

### Discussion

Plaintiff raises four arguments in his Brief in Support of the Complaint.  First, he argues that the ALJ failed to adequately develop the record with regard to his intellectual functioning and literacy.  Second, Plaintiff asserts that the ALJ erred in failing to reference or discuss the consultative evaluation from Nola Moore of the Midwest Bone and Joint Center.  Third, Plaintiff contends that substantial evidence did not support the ALJ's assessment of Plaintiff's RFC.  Finally, he argues that substantial evidence did not support the ALJ's determination that Plaintiff could work as a collator operator, small parts assembler, or connector assembler.  Defendant, on the other hand, contends that the ALJ properly evaluated Plaintiff's credibility and RFC and properly weighed the medical opinions.  Further, Defendant asserts that the VE's testimony was consistent with the Dictionary of Occupational Titles.  The undersigned finds that substantial evidence supports the ALJ's determination and the the decision of the Commissioner denying benefits should be affirmed.

### A.  Development of the Record

Plaintiff first argues that the ALJ should have fully and fairly developed the record by ordering a consultative examination to determine Plaintiff's intellectual functioning.  An ALJ is required to order a consultative examination "only if the available evidence does not provide an adequate basis for determining the merits of a disability claim."  Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).  Here, as noted by the Defendant, although the ALJ found Plaintiff had a learning disability, the record also demonstrated that Plaintiff had no difficulties with communication or understanding

during medical examinations.  (Tr. 229-86) Further, Plaintiff's daily activities demonstrated adequate intellectual functioning abilities.  (Tr. 38-43, 135-41, 153-59, 175-81) Finally, the ALJ considered Plaintiff's learning disability and limited the jobs Plaintiff could perform to only those requiring simple instructions, with no reading or writing.  (Tr. 18)

Plaintiff relies on Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994) and Gasaway v. Apfel, 187 F.3d 840 (8th Cir. 1999) to support his argument that the case should be remanded for development of Plaintiff's intellectual functioning.  However, neither case cited by Plaintiff is applicable to the case at hand.  In Battles, the plaintiff's "testimony that he was virtually illiterate, had not worked in fifteen years, ate out of garbage cans, slept in other people's cars, and had no relationships with other persons" raised an issue as to his mental capacity to engage in substantial gainful activity.  36 F.3d at 45.  The court also noted that the ALJ asked no questions about plaintiff's mental capacity to work.  Id.  Here, however, the record demonstrates that Plaintiff is able to care for himself, perform a multitude of activities including hunting, and have close relationships with family and friends.  (Tr. 39-43, 153-57) Further, the ALJ did hear testimony regarding his intellectual functioning, which Plaintiff described as not being very smart.  (Tr. 35-36)

In addition, Gasaway is inapposite to the present case.  In Gasaway, the plaintiff presented reports showing a verbal IQ score so low to consider her mentally retarded.  187 F.3d at 843. However, the ALJ failed to indicate that he evaluated or even noticed that the plaintiff could be mentally impaired.  Id.  Such is not the case here, where the ALJ not only assessed Plaintiff's learning disability, but also found it to be severe and included the credible limitations in the hypothetical question posed to the VE.  See Gragg v. Astrue, 615 F.3d 932, 940-41 (8th Cir. 2010) (noting that the ALJ's hypothetical question to the VE that plaintiff could not read or write and was limited to

simple tasks sufficiently represented the limitations imposed by the plaintiff's cognitive impairments).
Because the record contains an adequate basis for determining plaintiff's intellectual functioning, the
undersigned finds that the ALJ had no obligation to further develop the record by ordering a
consultative examination.

### B.  Nola Moore's Consultative Examination

Next, the Plaintiff contends that the ALJ erred in not discussing the consultative examination
conducted by Nola Moore, a nurse practitioner.  Defendant responds that the ALJ did consider Nurse
Moore's report.  In addition, Defendant maintains that a nurse practitioner is not an acceptable
medical source.  The undersigned agrees with the Defendant and finds that the ALJ adequately
considered Nurse Moore's report and gave the report proper weight.

Acceptable medical sources who can provide evidence to establish an impairment include
licensed medical or osteopathic physicians, licensed or certified psychologists, licensed optometrists,
licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a)(1)-(5).
Other sources from which the ALJ may consider evidence regarding the severity of a plaintiff's
impairment and how it affects his or her ability to work include medical sources such as nurse-
practitioners, physicians' assistants, chiropractors, and therapists.  20 C.F.R. § 404.1513(d)(1).

While the ALJ could, and indeed did, consider Nurse Moore's opinions under the regulations,
the ALJ was not obligated to give the opinions controlling weight. (Tr. 19, 197) See Social Security
Ruling, SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006) (distinguishing between "acceptable"
and "not acceptable" medical sources and stating that only "acceptable medical sources" can provide
evidence to establish the existence of a medically determinable impairment, give medical opinions,
and can be considered treating sources whose opinions may be entitled to controlling weight).

21

Instead, the ALJ properly weighed and considered Nurse Moore's opinion as "as an aid to understanding plaintiff's limitations." Williams v. Astrue, No. 1:09CV183FRB, 2011 WL 854796, at *19 (E.D. Mo. March 4, 2011). Indeed, the ALJ credited and adopted Nurse Moore's findings that Plaintiff had decreased motion in the left wrist and decreased grip strength on the left. (Tr. 19, 197) Thus, the undersigned finds that the ALJ properly evaluated, discussed, and relied on Nurse Moore's consultative examination.

### III.  The ALJ's RFC Assessment

The Plaintiff also argues that substantial evidence does not support the ALJ's RFC assessment because the record was void of any medical evidence demonstrating that Plaintiff could understand, remember, and carry out simple instructions; make simple work related decisions; deal with occasional changes in work processes and environment; or frequently use his left dominant upper extremity for reaching, handling, and fingering. Defendant, on the other hand, maintains that medical evidence fully supports the ALJ's RFC determination.

The undersigned finds that the ALJ correctly assessed Plaintiff's RFC in this case. With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). Some medical evidence must support the RFC determination. Eichelberger, 390 F.3d at 591 (citation omitted).

The undersigned finds that substantial evidence supports the ALJ's RFC determination in this

case. The record shows only slight limitations in Plaintiff's range of motion of the left upper extremity. (Tr. 197, 230, 232) Indeed, no medical doctor restricted Plaintiff's use of his left arm. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding substantial evidence supported the ALJ's decision where all but one doctor placed no restrictions on the plaintiff's ability to work). Of particular significance was the fact that Dr. Heligman could perform light work despite reduced range of motion and grip strength on the left. (Tr. 225) Additionally, Plaintiff's own testimony and function reports demonstrates an ability to perform a wide variety of tasks which required the use of both arms. (Tr. 38-43) In fact, Plaintiff injured his back when was cutting limbs from a tree. (Tr. 234)

With regard to Plaintiff's mental ability to work, as stated above, his testimony and the other evidence in the record merely shows that he had difficulty reading and writing. Nothing in the record demonstrates an inability to follow simple instructions. Further, the ALJ only rejected the state agency's non-examining medical consultant's mental assessment only to the extent the consultant rendered Plaintiff's learning disorder as "not severe." (Tr. 18) However, the record is replete with evidence, including the Psychiatric Review Technique form, that Plaintiff is able to appropriately understand and respond to instructions. (Tr. 221-86) Thus, the undersigned finds that the ALJ properly assessed and determined Plaintiff's residual functional capacity.

### IV. The ALJ's Job Determination

Last, Plaintiff asserts that the VE's testimony conflicted with the job classifications contained in the Dictionary of Occupational Titles ("DOT"). The Defendant contends that the ALJ justifiably relied on the VE's testimony to find that Plaintiff was capable of performing a limited range of light-work jobs.

The undersigned finds that the ALJ properly relied on the VE's testimony to find that Plaintiff was able to perform jobs existing in significant numbers in the national economy.  First, the undersigned notes that the ALJ complied with Social Security Ruling ("SSR") 00-4p in that the ALJ asked about any possible conflict between the VE evidence and the information in the DOT.  (Tr. 44); Renfrow v. Astrue, 496 F.3d 918, 920-21 (8th Cir. 2007).

In addition, the Court finds that no conflict exists in this case.  The definitions contained in the DOT are generic job descriptions proposing the approximate maximum requirements for the job, not the range.  Hillier v. Social Sec. Admin., 486 F.3d 359, 366-67 (8th Cir. 2007) (citations omitted).  Indeed, not all jobs have requirements as rigorous as those in the DOT.  Id.  Here, the job of collator operator, DOT § 208.685-010, required light strength and did not specify any reading.  Similarly, the positions of small parts assembler, DOT § 706.684-022, and connector assembler, DOT § 706.687-030, required light strength with no reading specified.  To the extent that the jobs specified a GED, the undersigned reiterates that the DOT states the maximum requirements, not the range.  Thus, the VE's testimony, which was based on a proper hypothetical question containing Plaintiff's credible limitations, does not conflict with the DOT.  As such, the ALJ was not required to obtain evidence explaining the alleged conflict, and substantial evidence supports the ALJ's determination that Plaintiff can perform work that exists in significant numbers in the national economy.  Renfrow, 496 F.3d at 921.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of March, 2012.